IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERYL L. HUFF, R. SCOTT
HUFF, TIMOTHY A. GUINN,
DAVID MILES, MARY MARTIN,
and JACKIE CRAIG

                **Plaintiffs,**

    **v.**

DEKALB COUNTY, GEORGIA,
and DAVID A. FOSTER,
Individually and in his Official
Capacity as Fire Chief of the DeKalb
County Fire & Rescue Services,

                **Defendants.**

**1:05-cv-1721-WSD**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary

Judgment [29], Defendants' Response in Opposition to Plaintiffs' Motion for

Partial Summary Judgment [35], and Plaintiff's Reply Brief in Support of Their

Motion for Partial Summary Judgment [44].  Before the Court also are Defendants'

Motion for Summary Judgment [28], Plaintiffs' Response in Opposition to

Defendants' Motion for Summary Judgment [43], and Defendants' Reply Brief in

Support of Defendants' Motion for Summary Judgment [68].[1]

## I.     BACKGROUND

Plaintiffs are paramedics employed by the DeKalb County Fire & Rescue Services ("DCFRS").  Plaintiffs were previously employed as paramedics by the Emergency Medical Services Bureau ("EMSB").  On November 20, 2001, the EMSB merged with the Bureau of Fire Services ("BFS") to form the DCFRS. Plaintiffs complain that the DCFRS treats employees formerly employed by the EMSB differently than it treats employees formerly employed by the BFS, particularly with respect to opportunities for training, firefighting experience, and promotion.  Plaintiffs claim that this disparate treatment violates the Equal Protection clause of the federal and Georgia constitutions.  Plaintiffs also claim

---

[1] Also before the Court is Plaintiffs' Notice of Objection And/Or Motion to Strike the Affidavits Filed By Defendants In Support of Their Motion For Summary Judgment and Response to Plaintiffs' Motion for Partial Summary Judgment [39] ("Plaintiffs' Motion to Strike").  Plaintiffs' brief itself demonstrates that the affidavit statements offered by Stanley-Chase are not inconsistent with or beyond the scope of her Rule 30(b)(6) deposition testimony.  Likewise, Foster's affidavit statements do not contradict Stanley-Chase's Rule 30(b)(6) testimony.
Some of Foster's statements constitute bare conclusions of law concerning the meaning of terms like "fire suppression."  The Court therefore GRANTS IN PART Plaintiffs' Motion to Strike with respect to ¶¶ 20 and 39 of the First Foster Affidavit, and ¶¶ 9-12 of the Second Foster Affidavit.  The Motion to Strike is otherwise DENIED.

that they were wrongly classified as employees in fire protection, and denied

overtime pay based on that wrongful classification.

From November 20, 2001, through May 24, 2003, paramedics employed by

the DCFRS, including Plaintiffs, were paid on an overtime schedule that provided

increased compensation for work exceeding forty (40) hours per week.[2]  ("40 hour

overtime.")

This policy changed when Defendant David Foster ("Foster") became Chief

of the DCFRS on January 2, 2003.  In early 2003, Foster issued a directive

requiring all paramedics, including Plaintiffs, to attend training to receive the

National Professional Qualification I ("NPQ I") firefighting certification.

Plaintiffs all received the NPQ I certification.  Plaintiffs David Miles ("Miles"),

Sheryl Huff, and Scott Huff later also received the NPQ II certification in advanced

firefighting.  The parties do not dispute that the NPQ I certification represents

training in fire suppression.

----

[2]  Defendants purport to deny that paramedics were paid 40 hour overtime at
the time of Foster's hire, but do not support their denial with a direct refutation of
the fact.  Instead, Defendants state only that "the merger had already occurred
when Foster was hired."  This is not a direct refutation of the fact alleged, because
it requires the Court to make the unsupported inference that Plaintiffs did not
receive 40 hour overtime pay at any point after the merger.  Pursuant to Local Rule
56.1.B(2), the Court must deem this fact admitted.  Defendants' denial is also
contradicted by their later admission that Plaintiffs received 40 hour overtime until
approximately May 24, 2003.

On May 24, 2003, after Plaintiffs had been certified at the NPQ I level of firefighting proficiency, paramedics, including Plaintiffs, were assigned to a 212 hour, 28 day work schedule.  After the DCFRS implemented this schedule change, Plaintiffs were no longer paid overtime according to the 40 hour schedule. Plaintiffs and other paramedics who had taken the required training only received overtime pay for hours worked in excess of 212 every 28 days.

On May 24, 2003, Plaintiffs were newly classified as "Fire Medics" or "Firefighter/Paramedics."[3]  These new titles carried new job descriptions, which the parties do not dispute included fire suppression duties.  There is no dispute that the actual daily job tasks performed by Plaintiffs after May 24, 2003, did not change substantially from those they performed as EMSB paramedics.  Despite their new job titles, Plaintiffs were not requested to engage in fire suppression activities, with the exception of Plaintiffs who obtained NPQ II certifications.[4]

---

[3]  Plaintiffs dispute the propriety of these titles, pointing to deposition testimony that they never in fact engaged in firefighting activities.

[4]  Defendants deny facially Plaintiffs' claim that the actual job duties performed by Plaintiffs on a daily basis did not change.  Defendants fail to directly refute the fact asserted.  Defendants make no claim regarding the substance of Plaintiffs' assertions of fact, and do not show what duties Plaintiffs actually performed or were asked to perform after May 24, 2003.

NPQ II certified Plaintiffs did, on a number of occasions, engage in fire suppression.

NPQ I certified Plaintiffs are assigned to rescue vehicles, but not to fire engines.  Rescue vehicles carry fire-protective "turnout gear"[5] for fighting fires, but not other fire suppression equipment.  Plaintiffs are regularly dispatched to fire calls.

Plaintiffs have been supervised by several DCFRS captains, including Captain Hugh Smith ("Smith"), Captain Victor McKinley ("McKinley"), Captain Richard Brooks ("Brooks"), and Captain Steve Brignone ("Brigone") (collectively, "station supervisors").  The parties do not dispute that the station supervisors believe NPQ I trained personnel to be inadequately trained to engage in fire suppression.  The parties also do not dispute that the station supervisors never assigned an employee with only NPQ I certification to engage in the act of putting out a fire.  The parties appear to dispute whether these station supervisors would have been responsible for making such assignments at the scene of a fire, or whether that responsibility would fall to an "incident commander" present at a fire scene.

---

[5]  "Turnout gear" is the heavy, protective, clothing and head gear familiar to shows in which firefighters are featured.

Miles and Sheryl Huff on a number of occasions were assigned to a fire engine and engaged in fire suppression.  After obtaining NPQ II certification in 2004, Miles was assigned to an engine at least once beginning in January of 2005. Sheryl Huff was assigned to a fire engine on at least four occasions between August and December of 2005.

The parties do not dispute that fire suppression duties are now part of Plaintiffs' formal job descriptions.  The parties also do not dispute that if Plaintiffs failed to follow orders from an incident commander at a fire scene, including orders to engage in fire suppression, they would have been subject to discipline.

Employees of the DCFRS, including Plaintiffs, can become qualified for promotion by meeting the requirements for certain positions set forth in the "Career Path" document published by the DCFRS.  Qualifications for particular positions typically include experience requirements, the successful completion of specific training classes, and passing a promotional examination.[6]

---

[6] The parties do not dispute that the DCFRS policy for promotion to the position of Fire Chief was to generate a rank-ordered list of persons based on their performance in the promotional and skills examination, and to promote in list order as positions became available.  Plaintiffs do not allege that Defendants failed to hire from this list or according to this procedure, but rather that Defendants improperly prohibited Plaintiffs from taking the examinations necessary to be included on the list.

In administering the training classes, including those necessary for promotion, the DCFRS sets deadlines for class enrollment, then reviews the enrollment applications submitted.  The class roster is filled from the applicant pool, according to seniority, but excluding applicants who do not meet the published course prerequisites.

After a DCFRS completes required classes and fulfills any other requirements, he is entitled to take a promotional examination.[7]  Plaintiff Scott Huff alleges that although he met the published requirements to take the promotional exam for the position of "Fire Captain," he was forbidden to take the exam because he did not meet an unpublished and unannounced requirement that he have 66 months experience with an NPQ certification.  Plaintiffs also allege that the DCFRS made a number of other exceptions to the Career Path requirements in favor of former BFS employees.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

_____

[7] For positions that require such examinations, such as "Fire Captain."

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999). There is no dispute of material fact if "a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." <u>Id.</u>

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. <u>United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.</u>, 894 F.2d 1555, 1558 (11th Cir. 1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." <u>Graham</u>, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." <u>Herzog</u>, 193 F.3d

at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

      B.     Paramedics as Overtime-Exempt Employees

Plaintiffs and Defendants both have moved for summary judgment on whether the DCFRS may avoid paying Plaintiffs' overtime for hours worked exceeding 40 in a week.  Defendants claim that Plaintiffs are exempt by statute from receiving overtime pay on the 40 hour schedule because Plaintiffs are employees "in fire protection activities."  Plaintiffs claim that they are not employees "in fire protection activities," and thus are not exempt employees as a matter of law, and are owed overtime pay.

Under the federal Fair Labor Standards Act, 29 U.S.C. §§ 202 et. seq., employers generally are required to pay employees at least time-and-a-half for hours worked beyond 40 in any given week.  Certain employees are exempt from that requirement.  Employees "in fire protection activities" are subject to less stringent requirements, which measure overtime compensation according to the employees' monthly, rather than weekly, work time.  The parties do not dispute

that Plaintiffs have not been paid according to a 40 hour overtime schedule since May of 2003.

29 U.S.C. § 207(a)(1) states, "no employer shall employ any of his employees . . . for a work-week longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §207(a)(1). Public agencies are partially exempted from this requirement "with respect to the employment of any employee in fire protection activities . . ." 29 U.S.C. § 207(k).

The term "employee in fire protection activities" is defined as:

> "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who:
> (1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and
> (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

29 U.S.C. § 203(y).

Section 203(y) sets forth five criteria, falling into two general categories, all of which must be met for an employee to be considered "in fire protection

activities."  The employee must: (1) be trained in fire suppression; (2) have the legal authority to engage in fire suppression; (3) have the responsibility to engage in fire suppression; (4) be employed by a fire department of a municipality, county, fire district, or State; and (5) be engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.  These five criteria embrace two general categories: the employee must (i) work for a firefighting government organization; and (ii) have some actual relationship to fighting fires.

It is undisputed that: (1) Plaintiffs are trained in fire suppression;[8] (2) Plaintiffs have the legal authority to engage in fire suppression; (3) Plaintiffs are or were employed by a "fire department" of DeKalb County; (4) and Plaintiffs respond to emergency situations where life, property, or the environment is at risk. The parties dispute only whether Plaintiffs have the "responsibility to engage in

---

[8]  Plaintiffs argue that they are not "trained in fire suppression," because DeKalb County requires employees to hold both NPQ I and NPQ II certifications before they can be classified as a "Firefighter I."  The Court finds Plaintiffs' interpretation unconvincing.  It is undisputed that all Plaintiffs are NPQ I certified, and that NPQ I certification represents an advanced level of training in fire suppression that exceeds the minimum training required by the state of Georgia for firefighters.  The statute does not require "training sufficient to attain the rank of firefighter in DeKalb County," it merely requires "training in fire suppression."  Whether DeKalb County considers NPQ I certified personnel competent to hold the position of "firefighter" has no bearing on whether NPQ I certified employees are trained in fire suppression within the meaning of the statute.

fire suppression."

First, the Court notes that exemptions to the FLSA, such as the one at issue here, "are to be narrowly construed against the employers seeking to assert them." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). The "application [of FLSA exemptions is] limited to those establishments plainly and unmistakably within their terms and spirit." Id.

The meaning of "responsibility to engage in fire suppression" in § 203(y) is an issue of statutory interpretation. The first step of statutory construction is to start "with the words of the statutory provision." CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001). When "the words of a statute are unambiguous . . . this first canon is also the last: judicial inquiry is complete." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997). See also United States v. Turkette, 452 U.S. 576, 580 (1981). When examining the words of a statute, "[i]n the absence of a statutory definition of a term, we look to the common usage of words for their meaning." CBS, 245 F.3d at 1222.

When the language of a statute is unambiguous, courts are not entitled to impose their own limitations upon it. See e.g., Turkette, 542 U.S. at 587 (reversing the First Circuit's construction of RICO because the limitations imposed were mandated by "neither the language nor structure of RICO . . ."). Unless there is a

"clearly expressed legislative intent to the contrary,  [unambiguous] language must ordinarily be regarded as conclusive."  <u>Id.</u> at 580 (quotation omitted).

The term "responsibility," when used in the sense of being responsible to do something, is variously defined as follows: "the state, quality, or fact of being responsible," that is, being "liable to be required to give account, as of one's actions or the discharge of a duty or trust." American Heritage Dictionary of the English Language (4th ed.  2000); the "quality or state of being responsible," that is, of being "liable to be called to account as the primary cause, motive, or agent" Merriam Webster Online Dictionary (http://www.m-w.com/dictionary, last visited January 30, 2007); "a burden, duty, or obligation for which one is responsible," that is, for which a person is  "answerable or accountable for one's actions." Wordsmyth Online Dictionary (http://www.wordsmyth.net, last visited January 30, 2007).

As used in § 203(y), "responsibility" must mean something other than training in fire suppression or legal authority to engage in fire suppression.  The Eleventh Circuit directs courts to read statutes as a "consistent whole."  <u>Burlison v. McDonald's Corp.</u>, 455 F.3d 1242, 1245-46 (11th Cir. 2006).  In doing so, the Court must respect the "longstanding . . . general principle that courts must not interpret one provision of a statute to render another provision meaningless."  <u>Id.</u> at

-13-

1247.  Section 203(y) applies to an employee who is "trained in fire suppression [and] has the legal authority <u>and</u> responsibility to engage in fire suppression." (emphasis added).  "Responsibility," therefore, must be something in addition to mere legal authority or training.

The common elements of the various definitions of "responsibility" are action and obligation–that is, what a person is obliged or required to do.  The few courts that have spoken on this issue have reached similar conclusions.  The Ninth Circuit Court of Appeals defined the ordinary meaning of "responsibility" in the statute as "some <u>real</u> obligation or duty. . . .  If a fire occurs, it must be [plaintiffs] job to deal with it."  <u>Cleveland v. City of Los Angeles</u>, 420 F.3d 981, 990 (9th Cir. 2005).

The court in <u>Cleveland</u> held that the paramedics in that case did not have a "responsibility to engage in fire suppression" because:

> (1) the paramedic ambulances do not carry fire-fighting equipment or breathing apparatuses; (2) a dispatcher does not know if he or she is sending single or dual function paramedics to a call; (3) paramedic ambulances are not regularly dispatched to fire scenes and are dispatched only when there appears to be a need for advanced life support services; (4) dual function paramedics are not expected to wear fire protective gear; (5) dual function paramedics are dispatched to a variety of incidents (e.g., vehicle accidents and crime scenes) at which they are expected to perform only medical services; and (6) there is no evidence that a dual function paramedic has ever

been ordered to perform fire suppression.

Id. at 991.

In Diaz v. City of Plantation, Fla, Civil Action No. 05-60757 (S.D. Fl.,
Sept. 15, 2006), the court applied a similar definition of "responsibility" and the
Cleveland framework to determine that dual-function paramedics were not in fire
suppression because:

> Plaintiffs are not equipped with firefighting equipment or
> gear; rescue units are only regularly dispatched to fire
> scenes where there is a need for medical services
> (including rehab); they also respond to purely medical
> calls; and there is no evidence that a rescue employee has
> been ordered to perform fire suppression. Consequently,
> Plaintiffs do not have the responsibility to engage in fire
> suppression.

Id. at *3.

In Lawrence v. City of Philadelpia, 2006 WL 2847330 (E.D. Pa.,
September 29, 2006), the court, using the Cleveland framework, held that dual-
function paramedics were in fire suppression because they (i) had to legal duty to
engage in fire suppression if so ordered by an incident commander; and (ii) had
been ordered to engage in fire suppression on "a number of occasions."  The court
also noted that the dual-function paramedics were issued and carried in their rescue
vehicles breathing apparatus and fire protective gear.

In the present case, it is undisputed that:  (1) Plaintiffs carry fire protective

"turnout" gear in their rescue vehicles; (2) Plaintiffs' rescue vehicles are staffed by at least two employees with fire suppression training; (3) Plaintiffs are regularly dispatched to fire scenes; (4) Plaintiffs are subject to discipline if they disobey an order to engage in fire suppression; and (5) Plaintiffs with NPQ II certifications, particularly Miles and Sheryl Huff, were on a number of occasions ordered to and did engage in fire suppression.  It is undisputed that Plaintiffs with only NPQ I certifications were never asked to engage in fire suppression.[9]

These factors are sufficient to establish that if a fire occurs, it is Plaintiffs' job "to deal with it."  Plaintiffs thus have the "responsibility" to engage in fire suppression, even if Plaintiffs Guinn, Craig, and Martin have never been required to exercise that responsibility.

_____

[9] Defendants generally, but not specifically, dispute that NPQ I certified Plaintiffs were not assigned fire suppression duties.  Defendants Response to Plaintiff's Statement of Material Facts skirts the issue of whether Plaintiffs were in fact assigned fire suppression duties.  Under Local Rule 56.1.B(2), the Court must "deem each of the movant's facts as admitted unless the respondent . . . directly refutes the movant's fact the concise responses supported by specific citations to evidence . . ."  Plaintiffs Guinn, Martin, and Craig state as a fact that they have never been assigned fire suppression duties.  Defendants respond by noting that fire suppression duties are within Plaintiffs' job description.  Defendants do not respond <u>directly</u> to Plaintiffs' contention.  At most, Defendants respond indirectly that fire suppression duties theoretically could have been assigned to Plaintiffs.  This response does not satisfy the Local Rule, and the Court therefore deems admitted that Plaintiffs Guinn, Martin, and Craig were never assigned fire suppression duties.

The Court's construction of § 203(y) is not, as Plaintiffs argue, "stretching" the definition of the term "responsibility" to mean "that the Plaintiffs could be called upon to engage in fire suppression someday."  In May of 2003, the DCFRS elected to implement an integrated organizational structure fully capable of responding to fires with overlapping, complementary, resources available to incident commanders.  These resources included dual-trained paramedics, who could be used to treat injuries or to suppress fire, or both, depending on the specific needs of the incident commander.  Former EMSB employees have significant experience attending to medical needs, and record evidence that incident commanders are inclined to deploy them at fire scenes primarily in accordance with that experience is not surprising.  Former BFS employees have significant firefighting experience, and record evidence that incident commanders are likewise inclined to deploy them in accordance with their experience is also not surprising.

It is undisputed that dual-function paramedics, including Plaintiffs, are regularly ordered to fire scenes and have the training, equipment, and duty to engage in fire suppression if an incident commander so orders them.  Plaintiffs can, if the need arises, and must, if asked, assist with fire suppression if extra personnel are needed.  Plaintiffs have offered no evidence that an incident commander would refuse to assign Plaintiffs to help suppress a fire if he found his other resources

insufficient.

Plaintiffs have shown, at most, that they constitute a deep reserve of the fire suppression capacity of the DCFRS.  The DCFRS has elected to structure itself to have versatile and adaptable human resources, while at the same time relying on the primary experiential strengths of those resources.  The record is clear that as dual-trained paramedics like Plaintiffs Huff and Miles obtain advanced NPQ II firefighter training, they are assigned fire suppression duties.  Training and experience, not formal job description, appear from the record to be the primary factors in determining which employees are called upon to engage in fire suppression.

While it may be true that incident commanders prefer not to use NPQ I certified former EMSB employees like Plaintiffs Guinn, Martin, and Craig for fire suppression, this preference does not mean that Plaintiffs lack the responsibility to engage in fire suppression. A third-string quarterback on a football team is unlikely to see playing time; he nonetheless has a responsibility to come to the game in uniform and play football for his team if called upon to do so by his coach. Similarly, Plaintiffs have a responsibility to bring turnout gear to fires and to

engage in fire suppression if called upon by an incident commander.[10]

It is undisputed that the DCFRS has required Plaintiffs to obtain advanced firefighting training, has equipped them with turnout gear, sends them regularly to fire scenes, and requires them to be available to assist with fire suppression if they are needed.  Plaintiffs thus have a responsibility to engage in fire suppression. The exercise of this responsibility may be contingent on the needs of an incident commander, and Plaintiffs may be called only rarely to fulfill it.  That fact does not make the responsibility less real.  Plaintiffs therefore do not fall within the exempt class of employees described by § 207(k).

C.     Equal Protection Under § 1983

Plaintiffs allege: (i) former EMSB employees are subjected to more rigorous experience requirements than former BFS employees to be eligible for promotion to the same positions; (ii) former EMSB employees are denied firefighting experience and responsibilities in favor of former BFS employees;

---

[10]  The record indicates that Plaintiffs Guinn, Martin, and Craig are likely aware that additional training as an NPQ II certified firefighter would enhance their chances of riding on a fire engine and being requested to engage in fire suppression.  If Plaintiffs were deemed not have the "responsibility" to engage in fire suppression with the NPQ I certification, they would be able to control whether they were overtime-exempt merely by neglecting or refusing to take NPQ II training.  This outcome is illogical, and allows the "training" requirement of § 203(y) to engulf the remaining factors of the statute.

(iii) Scott Huff was not allowed to take the examination for promotion to Fire

Captain, even though he met all the listed requirements, because extra, unwritten,

firefighter experience requirements favoring former BFS employees were added at

the last minute; and (iv) that Defendants enforced the Fire Captain requirements of

the Career Ladder against Scott Huff, while refusing to enforce the Rescue Captain

requirements against former BFS employees.[11]  Plaintiffs assert a § 1983 claim that

this unequal treatment violates their Equal Protection rights under the United States

and Georgia constitutions.

The legal standard governing equal protection claims depends upon whether

the classification made by the state is "suspect" by nature.  See, FCC v. Beach

Comms., 508 U.S. 307, 314 (1994).  When the unequal treatment alleged is based

on a non-suspect classification, Plaintiffs must show only: "(1) persons similarly

situated are treated differently by the government, and (2) the government fails to

provide a rational basis for the dissimilar treatment."  Dawson v. Scott, 50 F.3d

884, 892 (11th Cir. 1995) (emphasis in original).  See also City of Cleburne v.

Cleburne Living Center, 473 U.S. 432 (1985).

---

[11]  Plaintiffs make a number of other allegations about disparate treatment in
their responsive brief to Defendants Motion for Summary Judgment.  These
allegations, however, are not supported by Plaintiffs' Statement of Material Facts,
and so are not considered in determining whether Plaintiffs' claims survive
summary judgment.

An equal protection claim is subject to "rational relationship" review, and must fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>Beach Comms., Inc.</u>, 508 U.S. at 313. The rational basis need only be "reasonably conceivable;" it does not need to be the actual basis on which the government relied. <u>See</u> <u>Georgia Cemetery Assoc., Inc. v. Cox</u>, 353 F.3d 1319, 1321 (11th Cir. 2003) (holding irrelevant whether the "conceived reason was in fact the reason for the [differentiating] legislation."). The burden lies on the challenging party "to demonstrate that no conceivable basis exists to support the classification." <u>Resindiz-Alcaraz v. U.S. Atty. Gen.</u>, 383 F.3d 1262, 1271-72 (11th Cir. 2004)

Rational basis review "is not demanding." <u>Id.</u> at 1271. Courts proceeding pursuant to the rational basis standard "must be a paradigm of judicial restraint." <u>Id.</u> (quoting <u>F.C.C. Beach Comms.</u>, 508 U.S. at 314).

Defendants propose that "it is not in the best interest of the County or any of its residents to have a Rescue Captain, who is not fully trained in firefighting to take command of a fire scene," and that "not sending rescue trained personnel to command a fire where they do not have experience is rationally related to a legitimate governmental interest in protecting public safety." (Defs. Brief in Support of Mot. for Summary Judgment at 11.) Assuming, without deciding, that

the disparate treatment alleged by Plaintiffs occurred, Plaintiffs fail significantly to meet their burden to show that Defendants' basis for the disparate treatment is irrational.  Plaintiffs claim only that while there may exist "a reason why particular qualifications are required for promotion to Fire Captain," that reason does not justify rationally "the disparate treatment . . . between former EMSB and former BFS employees."

Plaintiffs' conclusory argument, devoid of support in the record, fails to establish that there is no rational relationship between the disparate treatment alleged and Defendants stated desire to secure public safety.  The specific disparate treatment complained of involves an alleged practice by the DCFRS of: (i) ensuring that the actual act of putting out structural fires is handled only by NPQ II certified employees, and preferably by former BFS employees; (ii) placing extra firefighting experience requirements on former EMSB employees seeking to be promoted to the position of Fire Captain, which includes the responsibility to take direct command of structural fire scenes, and otherwise biasing the promotional ladder in favor of former BFS employees; and (iii) not employing a reciprocal experiential bias in favor of former EMSB employees for the position of Rescue Captain.

Defendants could rationally believe that it is in the interest of the public safety to rely primarily on former BFS employees to engage in acts of fire suppression, and to bias the promotional path for supervisory firefighting positions in favor of former BFS employees, who have greater firefighting experience. Defendants could further rationally believe that reciprocally biasing rescue positions in favor of former EMSB employees for medical rescue positions is unnecessary to the public safety, and that the normal training and experience requirements are sufficient.  It is entirely rational for the DCFRS to treat former EMSB employees, as the record suggests and the Court discussed in the section above, as a deep reserve of their firefighting capacity.

The record shows that while former BFS employees may have been treated preferentially, former EMSB employees were not categorically excluded from firefighting roles or from opportunities for promotion to Fire Captain.  It is undisputed that at least Miles and Sheryl Huff engaged in fire suppression after obtaining the NPQ II certification.  Plaintiffs also admit that Scott Huff was not categorically excluded from the promotional examination for Fire Captain, but was only required to gain additional significant experience with the NPQ certification. This requirement, even if not imposed on former BFS employees, is consistent with the reasoning that the DCFRS has decided that those with greater experience

fighting fires should be trusted with the primary responsibility of extinguishing fires and with command of fire scenes.

These bases for the dissimilar treatment constitute an obvious conceivable rational ground on which Defendants can justify the greater experiential and promotional opportunities alleged to be given to former BFS employees, as opposed to Plaintiffs.

D.      State Constitutional Claims

Defendants move for summary judgment on Plaintiffs' claims under the Georgia Constitution.  Defendants argue: (i) no Georgia statute gives Plaintiffs a right to sue for monetary damages for violations of equal protection under the Georgia Constitution; (ii) no Georgia statute exempts Defendants in their official capacity from absolute sovereign immunity from suits pursuant to Georgia law; and (iii) that the state Equal Protection claims are coextensive with the federal Equal Protection claim, and should be dismissed for the same reason.

Under Georgia law, "counties . . . . are subdivisions of the sovereign state; and . . . since the sovereign state cannot be sued without its consent, the county cannot be sued without the consent of its creator, the state." Tounsel v. State Highway Dept. of Ga., 178 S.E. 285 (Ga. 1935).  The Georgia Supreme Court has also stated that a "right of action arises by necessary implication against a county

when it violates a constitutional right of a citizen." Id.; see also Waters v. DeKalb County, 69 S.E.2d 274, 278 (Ga. 1952).  This Court cannot hold as a matter of law that Plaintiffs are prohibited from bringing an action based on a bare violation of their rights under the Georgia constitution, even if no enabling legislation giving rise to an express right of action or an express exemption from sovereign immunity exists.

The scope of the Equal Protection Clause of the Georgia constitution is, however, coextensive with the scope of the Equal Protection Clause of the federal constitution.  Nodvin v. State Bar of Ga., 544 S.E.2d 142, 145 (Ga. 2001) ("Because the protection provided in the Equal Protection Clause of the United States Constitution is coextensive with that provided in Art. I, Sec. I, Par. II, of the Georgia Constitution of 1983, we apply them as one.").  As discussed above in reference to Plaintiffs federal Equal Protection claims, Plaintiffs fail to show that the alleged disparate treatment does not bear a rational relationship to DeKalb County's legitimate goals, or that the "facts on which the classification is apparently based could not reasonably be conceived to be true by the government decisionmaker."  Plaintiffs state constitutional claims thus fail.

E.    Other Claims

Defendants argue that Foster cannot be sued as an individual under FLSA,

and that he is protected by qualified and official immunity from suit.  Eleventh

Circuit law states clearly that "a public official sued in his individual capacity is

not an 'employer' subject to individual liability under the FLSA."  <u>Wascura v.</u>

<u>Carver</u>, 169 F.3d 683, 686 (11th Cir. 1999).  Defendants assert, and Plaintiffs do

not dispute, that the FLSA claims against Foster in his individual capacity must be

dismissed.

     Having ruled the Plaintiffs constitutional claims fail as a matter of law, it is

not necessary for the Court to rule on the immunity claims.

## III.   CONCLUSION

     Accordingly,

     **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary

Judgment [29] is **DENIED**.

     **IT IS FURTHER ORDERED** that Defendants' Motion for Summary

Judgment [28] is **GRANTED**.  The Clerk is directed to close this case.

     **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike [39] is

**GRANTED IN PART** and **DENIED IN PART**.  Paragraphs 20 and 39 of the

First Foster Affidavit, and paragraphs 9-12 of the Second Foster Affidavit, are

stricken from the record.

**SO ORDERED** this 30th day of January, 2007.


_____

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE